ROBBINS LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
CRAIG W. SMITH (164886)
csmith@robbinsllp.com
SHANE P. SANDERS (237146)
ssanders@robbinsllp.com
MARIA L. MANSUR (359802)
mmansur@robbinsllp.com
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH CEPEDA, Derivatively on Behalf of SUPER MICRO COMPUTER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES LIANG, SARA LIU, DAVID WEIGAND, SCOTT ANGEL, SHERMAN TUAN, TALLY LIU, JUDY LIN, ROBERT BLAIR, SUSAN MOGENSEN a/k/a SUSIE GIORDANO, YIH-SHYAN LIAW, DON CLEGG, GEORGE KAO, and DANIEL FAIRFAX,<br><br>Defendants,<br><br>-and-<br><br>SUPER MICRO COMPUTER, INC., a Delaware Corporation,<br><br>Nominal Defendant. | No.<br><br>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Super Micro Computer, Inc. ("Super Micro" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and unjust enrichment. These wrongs resulted in significant damages to Super Micro's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2. Artificial intelligence ("AI") has the potential to be the most transformative technology in human history. Its applications range from mundane consumer tasks to highly advanced scientific computation and sophisticated military systems. For example, recently one of the most advanced AI models was able to find vulnerabilities in classified United States government systems.

3. The United States is the current leader in AI, making the most advanced models and the most advanced computer chips needed to run these advanced models. In light of the massive harm that could result from nefarious actors having such abilities, the U.S. closely guards access to these capabilities. In particular, the U.S. prohibits companies from selling the most high-end processor chips to companies operating out of certain countries, including, most notably, China.

4. Super Micro is on the forefront of the AI revolution. Its revenues and stock price have exploded with the rapid growth of AI. For example, from June 30, 2020, to June 30, 2025, Super Micro's stock price has increased from under $28.39 to $490.10, a 1,700% increase. This

monumental increase, however, was not good enough for some Super Micro employees. Led by one of Super Micro's co-founders, defendant Yih-Shyan Liaw (a/k/a "Wally," "Liaw"), Super Micro employees repeatedly and knowingly evaded U.S. export-control laws, selling *billions* of dollars of restricted, advanced computing products to end users in China. In short, Super Micro, through defendant Liaw and others, placed short-term profits over the safety and security of the United States.

5. On March 20, 2026, defendant Liaw and certain others were arrested by the U.S. Department of Justice for "conspiring to unlawfully divert cutting edge U.S. artificial intelligence technology to China." The indictment issued in connection with the arrests details defendant Liaw and Super Micro's elaborate scheme to evade detection by the United States, as well as how Super Micro's financial results were inflated by these illegal sales to Chinese end users. The press release announcing the indictment quoted Assistant Director of the FBI's Counterintelligence and Espionage Division, Roman Rozhavsky, stating "[c]ontrolling the export of sensitive U.S. artificial intelligence technology is *essential to safeguarding our national security and defending the homeland*." (Emphasis added).

6. In the wake of the March 19, 2026 indictment disclosure, Super Micro's stock plunged approximately 33%, or $10.26 per share, on March 20, 2026, to close at $20.53 per share compared to the previous trading day's closing of $30.79 per share, erasing over $6 billion in market capitalization.

7. Unfortunately, Super Micro's evasion of export laws concerning China was not a one-off. Super Micro has a history of improper accounting practices. In addition, as recently as 2024, it was accused of channel-stuffing and violating export laws to supply sensitive equipment to Russia after its invasion of Ukraine.

8. The ultimate responsibility for Super Micro's recidivist violations lies with the Company's Board of Directors (the "Board"). Despite repeated and glaring red flags, the Board has refused to act. Instead, it has blindly allowed the Company's co-founders (two of which still sit on the Board) to dictate exactly how Super Micro operates.

9. In particular, defendant Liang (and his wife, defendant Sara Liu ("S. Liu")) have treated Super Micro as a fiefdom for enriching their own family. They have caused Super Micro to engage in hundreds of millions, if not billions, of dollars of related party transactions with companies owned by them and their family members. Defendant Charles Liang ("Liang") has instituted a high-pressure sales culture that supports loyalty above following the law. Indeed, as explained in more detail, defendant Liang has rehired numerous employees that were previously involved with the Company's illegal accounting that led to its temporary delisting from the NASDAQ. In such a culture, the Board should have been on heightened alert for employees pushing or flouting applicable laws, as employees did in the past. Instead, the Board sat on its hands, leading to the unacceptable repeated legal violations.

10. Further, as a direct result of this unlawful course of conduct, Super Micro is now the subject of numerous federal securities class action lawsuits filed in the United States District Court for the Northern District on behalf of investors who purchased Super Micro's shares.

## JURISDICTION AND VENUE

11. Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. §1331 because plaintiff's claims raise a federal question under section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 14a-9 (17 C.F.R. §240.14a-9) promulgated thereunder, and for contribution pursuant to section 21D of the Exchange Act. This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

13. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Super Micro maintains its principal place of business in this District; (ii) one or more of the

defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Super Micro, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## DIVISIONAL ASSIGNMENT

15. A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of Santa Clara and therefore, this action is properly assigned to the San Jose division.

## THE PARTIES

**Plaintiff**

16. Plaintiff Joseph Cepeda has been a stockholder of Super Micro since November 2024, has continuously been a stockholder since that time, and is a current Super Micro stockholder. Plaintiff is a citizen of Florida.

**Nominal Defendant**

17. Nominal defendant Super Micro is a Delaware corporation with principal executive offices located at 980 Rock Avenue, San Jose, California. Super Micro is a provider of total IT solutions and delivers rack-scale solutions for various workloads including artificial intelligence and high-performance computing. The Company also offers a portfolio of server and storage solutions for enterprise data centers, cloud service providers, and edge computing applications such as 5G Telco, Retail and embedded. As of June 30, 2025, Super Micro had 6,238 employees.

**Defendants**

18. Defendant Liang has been Super Micro's President, Chief Executive Officer ("CEO"), Chairman of the Board and a director since September 1993. Defendant Liang co-founded Super Micro in September 1993. Defendant Liang is married to defendant S. Liu. Defendant Liang is named as a defendant in related securities actions that allege he violated

sections 10(b) and 20(a) of the Exchange Act. Super Micro paid defendant Liang the following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $1 | - | $441 | $442 |
| 2024 | $1 | $28,094,976 | $250 | $28,095,227 |

19. Defendant Liang's $28,094,976 Option Awards value for fiscal year 2024 represents the grant- date fair value of the November 14, 2023 performance-based option to purchase up to 5,000,000 shares of Super Micro common stock at an exercise price of $45 per share (the "2023 CEO Performance Award"). Between February 27, 2025, and August 26, 2025, the Compensation Committee certified the achievement of four of the five revenue milestones under the 2023 CEO Performance Award and approved vesting of 4,000,000 of the 5,000,000 shares subject to the option. The milestones were certified at $13.0 billion (February 27, 2025), $15.0 billion, $17.0 billion, $19.0 billion (April 22, 2025), and $21.0 billion (August 26, 2025). Each of these revenue figures included revenues generated from the export-control diversion scheme alleged herein. Defendant Liang is a citizen of California.

20. Defendant S. Liu has been Super Micro's Senior Vice President since May 2019 and a director since September 1993. Defendant S. Liu was also Super Micro's Chief Administrative Officer from October 1993 to May 2019; Treasurer from September 1993 to May 2019; and Senior Vice President of Operations from May 2014 to February 2018. Defendant S. Liu co-founded Super Micro in September 1993. Defendant S. Liu is married to defendant Liang. Defendant S. Liu is a citizen of California.

21. Defendant David Weigand ("Weigand") has been Super Micro's Senior Vice President, Chief Financial Officer ("CFO") since February 2021. Defendant Weigand was also Super Micro's Chief Compliance Officer ("CCO") from May 2018 to March 2026. Defendant Weigand is named as a defendant in related securities actions that allege he violated sections 10(b)

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2025 | $557,958 | $180,979 | $1,166,317 | - | $55,638 | $441 | $1,961,333 |
| 2024 | $540,505 | $191,245 | $3,456,617 | $5,254,101 | $110,060 | $250 | $9,552,778 |

and 20(a) of the Exchange Act. Super Micro paid defendant Weigand the following compensation as an executive:

Defendant Weigand is a citizen of California.

22. Defendant Scott Angel ("Angel") has been Super Micro's Lead Independent Director since January 2026 and a director since March 2025. Defendant Angel has been a member of Super Micro's Audit Committee since at least March 2026. Super Micro paid defendant Angel the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $18,340 | $53,487 | $71,827 |

Defendant Angel is a citizen of Nevada.

23. Defendant Sherman Tuan ("Tuan") has been a Super Micro director since February 2007. Defendant Tuan has been a member of the Compensation Committee since at least 2024. Super Micro paid defendant Tuan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $129,385 | $160,768 | $290,153 |
| 2024 | $105,500 | $248,325 | $353,825 |

Defendant Tuan is a citizen of California.

24. Defendant Tally Liu ("T. Liu") has been a Super Micro director since January 2019. Defendant T. Liu was also Super Micro's Lead Independent Director from December 2023 to January 2026. Defendant T. Liu has been the Chair and a member of Super Micro's Audit Committee since at least December 2023. Defendant T. Liu has been a member of the Compensation Committee since 2024. Super Micro paid defendant. Liu the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $240,000 | $112,468 | $154,900 | $507,368 |
| 2024 | $140,000 | $174,344 | $154,470 | $468,814 |

Defendant T. Liu is a citizen of California.

25. Defendant Judy Lin ("Lin") has been a Super Micro director since April 2022. Defendant Lin was a member of Super Micro's Audit Committee from May 2024 to at least April 2025. Defendant Lin has been a member of the Nominating and Corporate Governance Committee since 2024. Super Micro paid defendant Lin the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $210,827 | $80,384 | $127,436 | $418,647 |
| 2024 | $77,993 | $124,163 | $127,197 | $329,353 |

Defendant Lin is a citizen of California.

26. Defendant Robert Blair ("Blair") has been a Super Micro director since December 2022. Defendant Blair has been a member of Super Micro's Audit Committee since May 2024. Defendant Blair has been a member of Super Micro's Nominating and Corporate Governance Committee since 2024. Super Micro paid defendant Blair the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $216,375 | $80,384 | $127,436 | $424,195 |
| 2024 | $68,184 | - | $254,505 | $322,689 |

Defendant Blair is a citizen of Arizona.

27. Defendant Susan Mogensen a/k/a Susie Giordano ("Giordano") has been a Super Micro director since August 2024. Defendant Giordano has been a member of the Compensation Committee since 2025. Super Micro paid defendant Giordano the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $76,894 | $166,503 | $243,397 |

Defendant Giordano is a citizen of California.

28. Defendant Liaw was Super Micro's Senior Vice President, Business Development from August 2022 to at least March 2026 a director from December 2023 to March 2026, and also from September 1993 to January 2018; Senior Vice President of International Sales from May 2014 to January 2018; Corporate Secretary from September 1993 to January 2018; and Vice

President of International Sales from September 1993 to April 2014. Defendant Liaw co-founded Super Micro in September 1993. Defendant Liaw is named as a defendant in related securities actions that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Liaw is a citizen of California.

29. Defendant Don Clegg ("Clegg") was Super Micro's Senior Vice President of Worldwide Sales from February 2018 to May 2026, and also Vice President, Marketing & Business Development from April 2006 to January 2018. Super Micro paid defendant Clegg the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2025 | $426,474 | $109,384 | $661,883 | - | $139,534 | $441 | $1,337,716 |
| 2024 | $448,722 | $112,817 | $2,295,602 | $2,624,889 | $277,510 | $250 | $5,759,790 |

Defendant Clegg is a citizen of California.

30. Defendant George Kao ("Kao") was Super Micro's Senior Vice President of Operations from at least May 2019 to December 2025, and also Vice President of Operations from October 2016 to May 2019. Super Micro paid defendant Kao the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2025 | $417,823 | $69,822 | $813,363 | $510,915 | $58,851 | $541 | $1,871,315 |
| 2024 | $407,691 | $68,823 | $343,181 | - | $88,751 | $250 | $908,696 |

Defendant Kao is a citizen of California.

31. Defendant Daniel Fairfax ("Fairfax") was a Super Micro director from July 2019 to June 2025. Defendant Fairfax was a member of Super Micro's Audit Committee from at least December 2023 to at least April 2025. Defendant Fairfax was a member of the Compensation Committee in 2024. Super Micro paid defendant Fairfax the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $212,695 | $160,768 | - | $373,463 |
| 2024 | $125,000 | $248,325 | - | $373,325 |

Defendant Fairfax is a citizen of California.

32. The defendants identified in ¶¶18, 29-31 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶18, 20, 22-27 are referred to herein as the "Director Defendants." The defendants identified in ¶¶22, 24, 26 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶23-24, 27 are referred to herein as the "Compensation Committee Defendants." The defendants identified in ¶¶23, 25-26 are referred to herein as the "Governance Committee Defendants." The defendants identified in ¶¶18, 20, 28 are referred to herein as the "Co-Founder Defendants." Collectively, the defendants identified in ¶¶18, 20-31 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

33. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Super Micro and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Super Micro in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Super Micro and not in furtherance of their personal interest or benefit.

34. To discharge their duties, the officers and directors of Super Micro were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Super Micro were required to, among other things:

(a) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b) remain informed as to how Super Micro conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable

inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

35. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Super Micro, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

36. The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in violations of export control laws, make false statements, improper practices that harmed the Company, and caused Super Micro to incur substantial damage.

37. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Super Micro, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Super Micro has expended, and will continue to expend, significant sums of money.

38. The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Super Micro.

**A. Duties Under Super Micro's Code of Business Conduct and Ethics**

39. Super Micro's Code of Business Conduct and Ethics (the "Code of Conduct"), revised as of October 28, 2020, applies to directors, officers, and employees of Super Micro. The Code of Conduct requires "[c]ompliance with applicable governmental laws, rules and regulations," "[h]onest and ethical conduct," and "[p]rompt internal reporting of any violations of law or the Code."

40. Concerning compliance, the Code of Conduct states:

> The Company is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for the Company. Numerous federal, state and local laws and regulations define and establish obligations with which the Company, its employees and agents must comply.... If you violate these laws or regulations in performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, and civil actions and penalties, you also subject the Company to the same risks and penalties.

41. The Code of Conduct designates Super Micro's CEO, CFO, and CCO as responsible for promoting compliance:

> The Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief Compliance Officer ("Compliance Officer"), General Counsel and Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

42. The Code of Conduct requires that the Company's public communications are "[f]ull, fair, accurate, timely and understandable", stating:

> All disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company must be full, fair, accurate, timely and understandable. You must take all steps available to assist the Company in these responsibilities consistent with your role within the Company.... You are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

43. The Code of Conduct highlights that the CEO and CFO are "responsible for designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of the Company's disclosure controls and procedures (as such term is defined by applicable SEC rules)."

44. The Code of Conduct prohibits deceptive acts and practices:

> Under federal and state laws, the Company is prohibited from engaging in unfair methods of competition, and unfair or deceptive acts and practices. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing.

45. The Code of Conduct further requires reporting of any violation or suspected violation of the Code, applicable laws, or governmental regulations, and provides confidential and

anonymous reporting channels—including via mail addressed directly to the Audit Committee Chair at the Company's headquarters.

46. Upon receiving a report of an alleged violation, the Code of Conduct requires an internal investigation:

> When an alleged violation of the Code, applicable laws and/or governmental regulations is reported, the Company will investigate and determine, or designate appropriate persons to investigate and determine, the legitimacy of the reports. Any suspected violation should be immediately reported to the Compliance Officer; however, to the extent that the suspected violation involves the Compliance Officer, such suspected violation should be immediately reported to the Chair of the Audit Committee. The Compliance Officer or the Chair of the Audit Committee, as applicable, shall assess the situation and determine the appropriate course of action.

**B. The Board's Ability to Pursue Investigations Pursuant to Its Charter**

47. The Board of Directors Charter, as amended through July 30, 2025 (the "Board Charter"), authorizes the Board to "conduct investigations" and to retain outside legal counsel and advisors "without consulting with or obtaining approval from any officer of the Company."

**C. Additional Duties of Audit Committee Members**

48. The Audit Committee Charter, as amended through July 30, 2025 (the "Audit Committee Charter"), sets forth additional duties for members of the Audit Committee. The Audit Committee is charged with assisting the Board in its oversight of, among other things, "the Company's compliance with legal and regulatory requirements."

49. In particular, the Audit Committee Charter states:

> Review any report on significant deficiencies in the design or operation of the Company's internal control structure and procedures for financial reporting ("Internal Controls") that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.
>
> Review and investigate conduct alleged to be in violation of the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary or other measures with respect to such conduct.
>
> Periodically review and discuss with management the Company's major financial risk exposures, as well as other major current and emerging risk exposures, including but not limited to, operational risks, health and safety risks, technology, privacy and cybersecurity risks, and strategic risks, and the steps management has

> taken to monitor and control the exposures, including the Company's risk assessment and risk management guidelines, policies and procedures.

50. The Audit Committee Charter further provides the Audit Committee with the authority, and the corresponding obligation, to investigate and take remedial action upon receipt of any complaint or report concerning "accounting, internal accounting controls or auditing matters."

**D. Additional Duties of Compensation Committee Members**

51. The Compensation Committee Charter, as amended through July 30, 2025 (the "Compensation Committee Charter"), requires the Compensation Committee to, among other things, "[m]onitor and assess risks associated with the Company's compensation policies, including whether such policies could lead to unnecessary risk-taking behavior, and consult with management regarding such risks."

52. The Compensation Committee Charter further charges the Compensation Committee with administering equity-based incentive compensation, including the 2023 CEO Performance Award. The Compensation Committee Defendants—Giordano (Chair), Tuan, and T. Liu—failed to assess and address the risk that the Company's compensation arrangements with the Officer Defendants—including defendant Liaw, whose senior-officer compensation depended on the appearance of Business Development success, and defendant Liang, whose 2023 CEO Performance Award milestones depended on the appearance of revenue growth—could incentivize, and did incentivize, conduct that violated the Code of Conduct and U.S. export-control laws.

**E. Additional Duties of Governance Committee Members**

53. The Nominating and Corporate Governance Committee Charter, as amended through July 30, 2025 (the "Governance Committee Charter"), charges the Governance Committee with, among other things, "[c]onduct[ing] an annual evaluation of each director's independence according to applicable Exchange rules, applicable law and the Company's corporate governance guidelines"; recommending to the Board that a director "submit his or her resignation from the Board if ... continuing service on the Board by the individual is not consistent with the criteria

deemed necessary for continuing service on the Board"; and "[p]rovid[ing] guidance and recommendations to the Board regarding legal compliance matters."

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

54. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Super Micro, regarding the Individual Defendants' management of Super Micro's operations and compliance with applicable laws; and (ii) enhance the Individual Defendants' executive and directorial positions at Super Micro and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

56. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty and unjust enrichment; and to conceal adverse information concerning legal compliance and source a material amount of its revenues.

57. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly violated export controls and misstated the Company's revenue sources. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE COMPANY VIOLATES EXPORT CONTROLS AND MISLEADS THE PUBLIC REGARDING THE SAME

### A. The Co-Founders Run Super Micro as Their Own Fiefdom

59. In 1993, defendant Liang, his wife, defendant S. Liu, and defendant Liaw founded the Company. Super Micro describes itself as a:

> Silicon Valley-based provider of total IT solutions which address demanding workloads from the enterprise and cloud to the intelligent edge. We deliver rack-scale solutions optimized for various workloads, including artificial intelligence ("AI") and high-performance computing ("HPC"), where acceleration is critical. Additionally, we offer an extensive portfolio of server and storage solutions for enterprise data centers, cloud service providers, and edge computing applications, such as 5G Telco, Retail and embedded.

60. Essentially, the Company designs and builds the "computing engines" that power cloud services, AI systems, and enterprise data centers. It is a hardware infrastructure company powering the AI and cloud economy.

61. Super Micro derives substantially all of its revenue from the sale of servers, many of which integrate advanced AI accelerator chips manufactured by NVIDIA Corporation ("Nvidia"). Super Micro maintains a strategic "first-to-market" relationship with Nvidia that permits it to ship the latest graphic processing units ("GPU") architectures in advance of certain competitors.

62. The Company has recently experienced massive growth thanks to the widespread adoption of AI. Between June 30, 2020, and June 30, 2025, Super Micro's revenue has increased from $3.34 billion to $21.97 billion. During the same time, its market capitalization increased from $1.47 billion to $29.25 billion.

63. According to the Definitive Proxy Statement on Schedule 14A filed with the SEC on March 3, 2026 (the "2026 Proxy Statement"), defendants Liang and S. Liu jointly own 82,084,339 shares of the Company's outstanding common stock, representing approximately

13.4% of the shares outstanding as of January 31, 2026. Defendant Liaw beneficially owned an additional 15,546,165 shares (approximately 2.6%), of which 15,184,220 shares were held by The Liaw Family Trust, for which defendant Liaw and his spouse serve as trustees. In the aggregate, the Co-Founder Defendants control approximately 16.0% of the Company's outstanding common stock.

64. The Co-Founder Defendants' long history as founders, executives, and substantial ownership gives them significant control over Super Micro's management and operations. A November 23, 2008, *New York Times* article titled "Super Micro Computer: A One-Man, or at Least One-Family Powerhouse," stated that employees view Liang with "reverence that borders on the cultish." An article from *Business Today*, a Taiwanese news source claimed defendant Liang demands such respect that even family members are afraid to speak with him, stating that they will sometimes stutter when talking with him.[1]

65. As the Company disclosed in its Annual Report on Form 10-K filed with the SEC on August 28, 2025 ("2025 10-K"), the Company has a key-person dependency on defendant Liang.

66. Defendant Liang has used his control of the Company to intertwine his family's businesses with Super Micro, most notably with his brothers' business, Ablecom Technology, Inc. ("Ablecom") and Compuware Technology, Inc. ("Compuware"). Defendants Liang and S. Liu also hold interest in these companies. The article from *Business Today* claimed that people describe Super Micro's AI ecosystem as being divided among the "three Liang brothers."

67. In particular, Ablecom's CEO, Steve Liang, is the brother of defendant Liang. Steve Liang and his family members owned approximately 35.0% of Ablecom's stock as of June 30, 2025. Defendants Liang and S. Liu collectively owned approximately 10.5% of Ablecom's capital stock as of June 30, 2025. Bill Liang, a brother of defendant Liang, owned approximately 1.8%

---

[1] The article further notes that another Liang brother founded his own company that has in turn become an Ablecom supplier.

of Ablecom's stock. Bill Liang is also a member of the board of directors of Ablecom. In addition, defendant Liaw's sibling owns approximately 11.7% of Ablecom's capital stock.

68. Bill Liang and his family members owned approximately 16.0% of Compuware's stock as of June 30, 2025. Ablecom owned approximately 15.0% of Compuware's stock. In addition, the same sibling of defendant Liaw owns approximately 8.7% of Compuware's capital stock. Bill Liang serves as the CEO and Chairman of the board of directors of Compuware, and Steve Liang is also a member of Compuware's board of directors.

69. The Company outsources a portion of its design and server chassis manufacturing of components to Ablecom. A majority of Ablecom's net sales come from the Company. For fiscal years ended June 30, 2025, 2024, and 2023, Super Micro purchased $321.9 million, $269.3 million, and $167.8 million, respectively, worth of products from Ablecom.

70. Super Micro appointed Compuware the non-exclusive authorized distributor of the Company's products in Taiwan, China, Australia, Malaysia, and the U.S. Super Micro also states that it, "entered into a series of agreements with Compuware, including multiple product development, production and service agreements, product manufacturing agreements, and lease agreements for office space." Super Micro and Compuware have done hundreds of millions of dollars' worth of deals with each other over the past three year.

71. The Company has also engaged in transactions with Leadtek Research Inc. ("Leadtek"). During the years ended 2025 and 2024, Super Mirco sold $0.7 million and $1.4 million of servers to Leadtek and purchased $0.5 million and $2.1 million of graphic cards from Leadtek, respectively. Ablecom and Compuware own approximately 30% of Leadtek. Steve Liang and Bill Liang have served as two of the seven members of the Leadtek board of directors. Steve Liang's oldest son is the President of Leadtek.

72. The *Hindenburg Research* report ("Hindenburg Report") revealed additional companies affiliated with defendant Liang's family that Super Micro has conducted business with but not disclosed in its proxies. Bill Liang is also a director and shareholder of a Hong Kong entity called "Ablestnet Technology Limited." Bill Liang is also the Chairman and material shareholder of Ablestnet Computer Inc ("Ablestnet") (which itself is a major shareholder of Compuware).

Ablestnet appears to resell Super Micro products and provide professional original equipment manufacturer ("OEM") services for electronic product assembly, testing, packaging and maintenance. According to the Hindenburg Report, Ablestnet and Compuware both operate out of the same building in New Taipei City.

73. The Hindenburg Report also revealed that defendant Liang's younger broth, James Liang, owns two Taiwanese entities that also make server components, Aeon Lighting Technology and Aeon Biotech (collectively "Aeon"). Both of these companies operate out of the Super Micro Science and Technology Park. According to the Hindenburg Report, Aeon is a supplier to Super Micro.

74. Notably, from 2007 until 2019, the Company did not maintain a related party transaction policy and it does not appear that the Audit Committee, the entity charged with reviewing the related party transactions, conducted an independent review of whether these related party transactions were in the best interests of the Company.

**B. The Export-Control Restrictions and the Resulting Compliance Imperative**

75. With the rapid advancement of AI, an arm's-race has emerged between countries over which can develop the most advanced AI, especially between the U.S. and China. The complexity behind AI development has led to a nearly insatiable appetite for GPUs, a specialized computer chip designed to handle graphics and other large-scale calculations quickly. The undisputed leader in making advanced GPUs for AI and high-performance computing is Nvidia. It is estimated that Nvidia GPUs have 80-95% of the AI GPU market share.

76. Super Micro and Nvidia are complementary partners. While Nvidia makes the GPUs, Super Micro builds the servers and systems that use those GPUs.

77. In October 2022, the Bureau of Industry and Security ("BIS") published a rule introducing license requirements on the export or re-export of advanced computing chips, including the Nvidia GPUs that Super Micro integrates into its highest-margin server products, and semiconductor manufacturing equipment to China and Hong Kong. Applications for licenses are reviewed under a "presumption of denial." The rule therefore effectively bars the export and

re-export of advanced AI servers, including those manufactured by Super Micro, to Chinese end users.

78. The BIS explained that the export controls were imposed to protect U.S. national security and foreign-policy interests by restricting China's ability "to produce advanced military systems including weapons of mass destruction; improve the speed and accuracy of its military decision making, planning, and logistics, as well as of its autonomous military systems; and commit human rights abuses." The restrictions thus reflect a formal U.S. government determination that the computing capabilities in advanced AI accelerator hardware are of strategic significance.

79. In January 2025, the President introduced the "AI Diffusion Rule." This rule set regulations that prevented sales of Nvidia's flagship GPUs to China based on certain performance standards.

80. As the Company itself acknowledged in its public filings throughout the period of misconduct alleged herein, Super Micro's products were directly subject to these restrictions. In its Annual Report on Form 10-K filed with the SEC on February 25, 2025 ("2024 10-K"), the Company disclosed that the export controls "impacted certain of our products, including products that contain the NVIDIA A100 and H100 integrated circuits, among others."

81. Compliance with U.S. export-control laws was therefore, for Super Micro, a core operational matter critical to Super Micro's success, mandating substantial oversight. The Audit Committee Charter, the Board Charter, and the Code of Conduct each required the Individual Defendants to oversee the Company's compliance with these laws. The Company's compliance program was led by defendant Weigand in his capacity as CCO.

**C. The Company Is a Recidivist Lawbreaker**

82. Super Micro has a long history of flouting American laws. In December 2001 and January 2002, Super Micro sold computer motherboards to a company located in United Arab Emirates. The Company knew at the time it sold the motherboard that they were destined for Iran. At that time, the U.S. federal commodity export rules banned shipment of such motherboards to

Iran for securities reasons. In the Company admitted to the violations, a felony. The Company's lawyer stated that Super Micro "didn't have all of the required policies and producers in place[.]"

83. In August 2017, Super Micro announced it was unable to file its Annual Report. It would take years before it was able to do so, eventually restating its financials in May 2019. As a result, Nasdaq delisted Super Micro from 2018 through 2020.[2]

84. On November 15, 2018, the Company announced that the Board determined that its financial statements from the fiscal years 2015 to 2017 could no longer be relied upon because of revenue recognition errors. Among other issues, Super Micro had made improper "quarter-end cut-off determinations and allocation of revenue determinations for customer contracts with service elements."

85. The Audit Committee conducted an investigation related to a "restructuring of the Company's sales organization as part of the Company's remediation of material weaknesses in its internal control over financial reporting[.]" On May 17, 2019, Super Micro filed its Annual Report on Form 10-K for the 2017 fiscal year, disclosing numerous material weaknesses that prevented Super Micro from recording transactions as necessary and preparing financials statements in conformity with generally accepted accounting principles ("GAAP"). The material weaknesses included:

> a. Aggressively focusing on quarterly revenue without sufficient focus on compliance;
>
> b. A failure by senior management to establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire company;
>
> c. An inappropriate tone at the top; and
>
> d. A failure to hire personnel who had appropriate levels of knowledge and experience or to provide adequate training to its personnel.

[2] At this time, defendant Liang had pledged his Super Micro stock as collateral for loans. With the delisting, banks called the margin loans. Defendant Liang borrowed $12.9 million from the wife of his brother Steve Liang to repay the loan.

86. Defendant Liaw resigned (or was terminated) in January 2018, as did three other high-level executives, including the Company's CFO. In addition, according to the whistleblower complaint, defendant S. Liu needed to leave her role to placate the Company's external auditors.

87. The SEC subsequently charged the Company with widespread accounting violations that included improper revenue-recognition practices and material misstatements of the Company's financial reports, including that Super Micro's senior management had directed the Company's premature recognition of more than $200 million in revenue and understated expenses over the previous three years.

88. The SEC found that "executives pushed employees to maximize end-of-quarter revenue and minimize expenses, without devising and maintaining sufficient internal accounting controls to record revenue and expenses in conformity with U.S. Generally Accepted Accounting Principles ('GAAP')."

89. The SEC also stated that Super Micro improperly recognized revenue by:

> (1) recognizing revenue before delivering the goods to customers; (2) sending goods to customers prior to the customer-specified delivery date; (3) improperly changing the shipment terms to a large Super Micro customer in order to recognize revenue upon shipment rather than when the goods were delivered to the customer; (4) recognizing revenue with respect to transactions that included customer acceptance terms before the customers had accepted the goods; (5) sending incomplete or mis-assembled goods to customers at the end of quarters; (6) recognizing revenue on sales to a large distributor upon shipment, when the revenue should have been recognized when Super Micro received payment from the distributor; (7) holding the bill of lading for certain overseas customers and thus preventing the customers from taking possession of the goods as a means to ensure payment, but nevertheless improperly recognizing the revenue upon shipment; and (8) recognizing certain extended warranty revenue at the time of sale, rather than amortizing the revenue over the length of the warranty.

90. The SEC also explained that:

> Super Micro also improperly under-reported certain expenses by misusing its cooperative marketing program to pay a variety of unrelated expenses, such as warehousing costs for goods at quarter end, shipping costs, and product repair costs. Super Micro employees also submitted claims for funds to which Super Micro was not entitled in connection with a vendor's cooperative marketing program. In addition, Super Micro over-valued inventory and under-stated expenses by failing to reduce inventory and record an associated expense in instances where Super Micro no longer held the inventory for sale.

91. As a result, Super Micro violated antifraud, reporting, books and records, and internal accounting controls provisions of the federal securities laws.

92. The Company entered into a cease-and-desist order with the SEC on August 25, 2020, ultimately resulting in a $17.5 million settlement and the obligation of defendant Liang personally to reimburse the Company $2.1 million in stock-sale profits (though defendant Liang was not formally charged).

93. According to reports, defendant Liaw oversaw the sales teams that were involved in the accounting violations. According to a report from *Hindenburg Research*, former Super Micro employees stated that defendant Liaw was directly involved int eh accounting improprieties, stating:

> *The stuff I remember that was a* ***little bit more egregious…an example, putting stuff on a truck and [that] truck would sit in someone's parking lot for a few days.*** *That to me was more of like an arrangement with the transportation company. Not great… And then based on the investigation,* ***it sounds like it was Wally****. So then Wally got let go.*

94. Soon after, in 2020, defendant S. Liu returned to active management of the Company. Super Micro then began rehiring additional employees that were associated with the unlawful accounting actions. For example, the Company re-hired Peggy Lin, who soon became Super Micro's Chief Administrative Officer.

95. Defendant Liaw returned to Super Micro as a consultant in May 2021. On August 3, 2022, Super Micro rehired defendant Liaw as Senior Vice President, Business Development. According to reports, defendant Liang and others at the Company did not consult with the Audit Committee before rehiring defendant Liaw.

96. On December 8, 2023, the Company filed a Current Report on Form 8-K with the SEC announcing that defendant Liaw had been re-appointed to the Board. The period of misconduct alleged herein began approximately two months later, on February 2, 2024. At the Company's January 2024 annual meeting of stockholders, the Board nominated defendant Liaw

for, and the Company's stockholders re-elected defendant Liaw to, a full three-year term as a director.

97. The Board re-appointed defendant Liaw to a senior-officer position and to the Board notwithstanding (a) his prior departure under circumstances tied to the remediation of material weaknesses in the Company's internal control over financial reporting; (b) the absence of any independent investigation by the Board or its Audit Committee into the conduct that led to his 2018 departure; and (c) the absence of any meaningful enhancement of the Company's export-compliance function in the period leading up to his re-appointment, notwithstanding the introduction of the October 2022 export-control restrictions.

98. Though the SEC linked the Company's pressure to meet performance metrics to the accounting scandal, the Board continued to approve compensation packages that continued these links. In particular, defendant Liang receives only a de minimis salary of $1. However defendant Liang will receive significant bonus awards if the Company hits certain revenue milestones. Thus, it came as no surprise when reports emerged that defendant Liang was once again creating a high pressure sales force, especially after rehiring a number of scandal-linked employees.

99. In April 2024, Bob Luong ("Luong"), Super Micro's former General Manager, Service and Strategic Solutions, brought a whistleblower complaint against Super Micro. Luong stated that he routinely interacted with defendant Liang. Luong's lawsuit claimed that Super Micro engaged in falsified revenue recognition after being relisted in 2020. In particular, Luong stated that: (a) revenue was incorrectly allocated to hardware sales rather than service to artificially boost reported profit margins; (b) revenue was prematurely booked even when equipment could not be delivered to and installed for customers; and (c) revenue was prematurely booked even when products were faulty or not ready for sale. Luong also claimed that at Super Micro there would be the approval of service contracts in circumvention of the existing approval process and controls and personnel were not allowed to revalue inventory to write off obsolete ad missing equipment.

100. On August 27, 2024, *Hindenburg Research* published a report "Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at this AI High Flyer."

101. The Hindenburg Report also discussed the rehiring of the individuals involved in the Company's previous accounting improprieties. For example, Super Micro rehired Salim Fedel ("Fedel"),[3] the Vice President of Sales during the accounting scandal, as Vice President of Business Development and Strategic Sales in October 2020. A former employee told *Hindenburg Research* about Fedel, "He was involved with the restatement. He was one of the sloppy salespeople. He got fired because he was so aggressive."

102. The Company at some point also rehired Phidias Chou ("Chou"). Chou resigned alongside defendant Liaw in 2018. At some point, according to the Hindenburg Report, Super Micro rehired Chou.

103. Demonstrating Liang's control of the Company, *Hindenburg Research* discussed its communications with former employees that stated that the "rehires were borne out of long-standing relationships with []Liang, who valued loyalty over all else."

104. *Hindenburg Research* also uncovered evidence of channel stuffing. *Hindenburg Research* reported that former employees claimed that salespersons worked with distributors to over-ship product to boost numbers. Similar to the previous accounting scandal, according to *Hindenburg Research*, defendant Liang placed salespersons under "massive pressure" to meet numbers.

105. The rehires also included the Liang Family of companies. Howard Hideshima ("Hideshima") was the CFO during Super Micro's accounting scandal and specifically named by the SEC for engaging in "improper accounting". Hideshima had to pay over $350,000 for his role in that scandal. In May 2023, Ablecom Technology hired as a consultant.

**D. Defendant Liaw Hatches His Scheme as the Board Fails to Oversee Export-Control Compliance**

106. From the introduction of the October 2022 export-control restrictions, the Individual Defendants failed to implement or maintain any effective system of internal controls to ensure the Company's compliance with U.S. export-control laws governing the sale and re-export

[3] The whistleblower complaint incorrectly spells Fedel's last name as "Fidel".

of advanced computing hardware. The Individual Defendants did not establish or supervise an effective end-user verification function, did not establish or supervise an effective distribution-channel auditing function, and did not establish or supervise an effective process for investigating publicly available reports that Super Micro servers were being diverted to controlled- end-user destinations in China.

107. Defendant Liaw began his scheme to evade U.S. export controls to boost the Company's revenue in 2023. Defendant Liaw and others at the Company used OBON Corporation Co., Ltd. ("OBON"), a Thai company, as a pass-through entity to sell the Company's products to China-based end customers.[4] Using OBON gave the transactions the "appearance of legitimate commercial activity." OBON rapidly grew to one of Super Micro's eleven most profitable customers and accounted for over $2.5 billion in sales. OBON alone accounted for almost $100 million in revenue in the fourth quarter of the 2024 fiscal year.

108. Recognizing the importance of OBON, defendant Liaw thanked it for the "help for June" and promised "[i]n return" to "help [OBON] the whole year." Defendatn Liaw also instructed OBON to transfer tens of millions of dollars to Super Micro so that Super Micro could place Nvidia GPU allocation orders and reserve inventory for subsequent diversion to China through OBON.

109. On August 27, 2024, *Hindenburg Research* published its report. The Hindenburg Report alleged in detail that Super Micro had circumvented U.S. trade restrictions imposed in response to Russia's invasion of Ukraine by shipping products into the Russian Federation in "larger-than-ever volumes" through a California distributor and a network of Turkish shell companies. The Hindenburg Report detailed the rise in the Company's exports to Russia after its invasion of Ukraine, explaining that exports to Russia rose to $126.6 million in 2023, 9.6 times more than in 2021.

[4] The indictment lists discusses a "Company-1". Later reporting has explained that "Company-1" is OBON.

110. On September 26, 2024, the *Wall Street Journal* reported that the U.S. Department of Justice ("DOJ") opened an investigation into Super Micro. On February 11, 2025, the Company announced to the public that it received subpoenas from the DOJ and SEC in late 2024.

111. The Company's independent auditor, Ernst & Young LLP ("EY"), resigned in October 2024, citing concerns about, among other matters, "the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management." EY had also identified "[e]port control matters" and had identified eleven export transactions for further review. The Board formed a special committee in August 2024 to investigate EY's concerns.

112. In October 2024—at or around the same time that EY was resigning as the Company's auditor—Super Micro's internal compliance team placed a temporary hold on shipments to OBON and initiated an audit of OBON in response to its rapid growth in order volumes (the "October 2024 Internal Audit"). Defendant Liaw and Ruei-Tsang "Steven" Chang ("Chang") took active steps to obstruct the October 2024 Internal Audit, including by (a) preventing the auditors from physically entering OBON's purported data-center facilities; (b) arranging for an auditor whom Chang described in writing as "friendly" to conduct the review; and (c) fabricating purported data-center lease agreements to create the false appearance that OBON possessed sufficient data-center capacity to justify its server purchases.

113. On December 2, 2024, the Company announced that the special committee of the Board announced that it "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions, or that anyone at the Company was aware that any of its products might be diverted to a prohibited end user or location," and that "it appears the Company has implemented a reasonable program for compliance with applicable export control regulations."

114. Around December 14, 2024, defendant Liaw texted an executive OBON: "Roughly how many you can take by January? Feb? March? April? Just roughly forecast will be fine.... Then we can propose to [Nvidia] with the way they can accept.... This is the only way to have [Nvidia] to promise the B200 allocation so far as I know." Defendant Liaw thereafter continued to

coordinate the diversion of Super Micro servers to China through the entirety of fiscal year 2025 and into fiscal year 2026.

115. On December 19, 2024, *Reuters* and *The Information* reported that Nvidia had asked its large distributors, including Super Micro, to conduct spot checks of their customers in Southeast Asia to verify that those customers were still in possession of the servers equipped with Nvidia chips and had not sold them to China. Nvidia's request was prompted by an inquiry from the U.S. Department of Commerce as to how Nvidia chips were being smuggled into China despite export controls. Super Micro responded with categorical denials of any diversion involving its products.

116. In April 2025, Super Micro's internal compliance team again imposed a temporary hold on shipments to OBON and initiated a second audit (the "April 2025 Internal Audit"). Defendant Liaw and his co-conspirators undermined the April 2025 Internal Audit by drafting responses to the Company's compliance team in an effort to lift the hold. After the hold was lifted, OBON's purchase orders to Super Micro "ballooned." Between late April 2025 and mid-May 2025 alone, at least approximately $510 million worth of Super Micro servers, assembled in the United States and containing Nvidia GPUs subject to U.S. export controls, were sold to OBON and then diverted to China.

117. In August 2025, the BIS notified Super Micro directly that it had reason to believe that OBON was diverting the Company's servers to China. The BIS requested that Super Micro impose a compliance hold on all shipments to OBON.

118. In December 2025, a BIS export-control officer conducted a post-shipment verification at a warehouse used by OBON. Co-conspirator Ting-Wei "Willy" Sun ("Sun") impersonated a law-firm assistant during the verification visit and presented the BIS officer with "dummy" non-working servers that had been staged at the warehouse the previous day. Upon receipt of photographs and video of the staged dummy servers, defendant Liaw responded "That's spectacular!" and immediately pressed OBON to place additional orders, writing "Order now!"

119. Notwithstanding these unmistakable warnings about the Company's export-compliance function, the Individual Defendants did not implement any meaningful remediation of

that function. They permitted defendant Liaw, already in possession of the Senior Vice President of Business Development title and a Board seat, to direct the very Business Development organization through which the diversion scheme was conducted.

120. Tellingly, the Audit Committee was actively meeting throughout the period of misconduct alleged herein and was in possession of substantial information bearing on the Company's compliance and internal-control posture. According to the 2026 Proxy Statement, the Audit Committee met seventy times during fiscal year 2025 alone, four regularly scheduled meetings and sixty-six special meetings. The Audit Committee Defendants thus cannot credibly maintain that they were unaware of the operational and compliance risks facing the Company; their unique vantage point is, instead, an indictment of their failure to identify, investigate, or remediate the export-control violations being orchestrated by Defendant Liaw.

### E. The Individual Defendants Allowed the Dissemination of Material False and Misleading Statements

121. Throughout the relevant period, the Individual Defendants caused the Company to issue public statements concerning the Company's compliance with U.S. export-control laws and the sources of the Company's reported sales growth.

122. On February 2, 2024, Super Micro filed with the SEC its Quarterly Report on Form 10-Q for the second quarter of fiscal year 2024 (the "Q2 FY24 10-Q"), which was signed by defendants Liang and Weigand. The Q2 FY24 10-Q contained SOX Section 302 certifications signed by defendants Liang and Weigand attesting that "the financial statements and other financial information" therein "fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of and for the periods presented in this report." The Q2 FY24 10-Q incorporated by reference the "Risk Factors" section of the Company's Annual Report on Form 10-K for fiscal year 2023 ("2023 10-K"), including the representation that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

123. On April 23, 2024, *Reuters* reported that Chinese universities and research institutes had recently obtained high-end Nvidia AI chips despite the export restrictions on the technology.

According to the article, tender documents showed that Chinese entities obtained the chips embedded in server products made by Super Micro and other server manufacturers. The article quoted Super Micro as stating that it "complied with U.S. requirements on the sale and export of [Graphics Processing Unit] systems to regions and parties that require licenses," and that "[i]f we become aware that a third party has exported or reexported without the required licenses, we investigate the matter and take appropriate action."

124. Additionally, the law firm Clare Locke LLP sent a letter to *Reuters* on Super Micro's behalf representing that the Company "goes above and beyond what U.S. export restrictions require" by proactively taking steps to ensure its customers do not violate the curbs.

125. On May 6, 2024, Super Micro filed with the SEC its Quarterly Report on Form 10-Q for the third quarter of fiscal year 2024 (the "Q3 FY24 10-Q"), signed by defendants Liang and Weigand and accompanied by their SOX Section 302 certifications. The Q3 FY24 10-Q incorporated by reference the same export-compliance risk-factor language from the 2023 F10-K.

126. On August 6, 2024, Super Micro issued a press release announcing financial results for the fourth quarter and full fiscal year 2024, including fiscal year 2024 net sales of $14.94 billion (an increase of 110% year-over-year). In the press release, defendant Liang represented that the Company's growth was driven by "record demand of new AI infrastructures propelling fiscal 2024 revenue up 110% to $14.9 billion" and that the Company was "well positioned to become the largest IT infrastructure company."

127. On August 12, 2024, *The Information* published an article titled "Nvidia AI Chip Smuggling to China Becomes an Industry," reporting on the emergence of a structured industry diverting advanced AI chips into China and identifying Super Micro's servers as among the products implicated. The article quoted Super Micro as stating: "We follow all US export control requirements on the sale, service, support, and export of our GPU-based systems. If we find out that a third party has exported these without required licenses, we promptly investigate the matter and take appropriate action."

128. On August 28, 2024, Super Micro issued a press release announcing that it would not timely file its Annual Report on Form 10-K for fiscal year 2024. Two days later, on August

30, 2024, the Company filed with the SEC a Notification of Late Filing on Form NT 10-K, disclosing that the delay was attributable to "information that was brought to the attention of the Audit Committee of the Company's Board of Directors" which had caused the Board to form "a committee to review certain of the Company's internal controls and other matters" (the "Special Committee"). The Form NT 10-K did not identify the substance of the "other matters" under review, but as the Company would subsequently disclose, those matters included the Company's failure to comply with U.S. export-control laws. In response to the August 28, 2024 announcement, the price of Super Micro common stock declined 19%, from a closing price of $54.76 on August 27, 2024 to a closing price of $44.35 on August 28, 2024 (pre-split equivalents).

129. On October 30, 2024, Super Micro filed a Current Report on Form 8-K announcing the resignation of EY as the Company's independent registered public accounting firm. Among other things, the 8-K disclosed that EY had communicated to the Audit Committee concerns about "the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management." EY further stated, in its resignation letter, that it was "unwilling to be associated with the financial statements prepared by management." The Company subsequently engaged BDO USA, P.C. ("BDO") as its successor independent registered public accounting firm. As alleged below, EY's October 24, 2024 resignation occurred contemporaneously with the obstruction by Defendant Liaw and Super Micro sales manager Chang of an internal compliance audit of the Southeast Asian passthrough entity later identified in the Indictment as "Company-1," and approximately five weeks before the Company would disclose that EY's concerns included at least eleven specific export-control transactions.

130. On November 13, 2024, Super Micro filed with the SEC a Notification of Late Filing on Form NT 10-Q, announcing that the Company would not timely file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2024 because of the Special Committee's continuing work and "other work that is ongoing." This was the second consecutive missed periodic-report filing deadline by the Company. The Director Defendants, including the members

of the Audit Committee at the time, again failed to identify, investigate, or remediate the export-control violations the Special Committee was simultaneously failing to detect.

131. On December 2, 2024, Super Micro filed a Current Report on Form 8-K with the SEC, signed by defendant Liang and attaching a press release disclosing the findings of the Special Committee's review. The December 2, 2024, Form 8-K disclosed, among other things, that EY had communicated concerns to the Audit Committee regarding "[e]xport control matters" and had specifically identified eleven export transactions for further review. The December 2, 2024 Form 8-K further disclosed that the Special Committee's "Review focused on whether, at the time of shipment, [the eleven] transactions complied with relevant U.S. export laws and regulations." The Special Committee, the work of which was reviewed and approved by the Audit Committee (which included defendants T. Liu and Blair), concluded that it "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions, or that anyone at the Company was aware that any of its products might be diverted to a prohibited end user or location," and that "it appears the Company has implemented a reasonable program for compliance with applicable export control regulations."

132. On December 19, 2024, *Reuters* and *The Information* reported on Nvidia asking Super Micro and other distributors to spot check their customers in Southeast Asia. Super Micro responded with categorical denials of any diversion involving its products. In the same month, Super Micro published on its website an "Export Compliance Policy" pledging "full compliance" with U.S. export laws.

133. On February 25, 2025, more than seven months after the close of fiscal year 2024 and after a substantial filing delay, Super Micro filed its 2024 10-K. The 2024 10-K was signed by defendants Liang, Weigand, S. Liu, Liaw, Lin, Blair, Tuan, Giordano, Fairfax, and T. Liu, and incorporated SOX Section 302 certifications signed by defendants Liang and Weigand. The 2024 10-K represented that the Company's internal control over financial reporting was effective as of June 30, 2024, that the Company maintained controls to ensure compliance with applicable laws and regulations, and that the Company's reported sales growth was attributable to "strong demand and increased billings for GPU & Super Racks."

134. On May 6, 2025, Super Micro held its third quarter fiscal year 2025 earnings call. During the call, defendant Weigand represented that China "continued to represent less than 1% of sales" in the third quarter of fiscal year 2025.

135. On May 12, 2025, Super Micro filed its Quarterly Report on Form 10-Q for the third quarter of fiscal year 2025 (the "Q3 FY25 10-Q"), signed by defendants Liang and Weigand and accompanied by their Sarbanes-Oxley certifications. The Q3 FY25 10-Q repeated the Company's export-compliance representations and disclosed no information regarding any diversion of Company products to China through third-party distributors.

136. On August 5, 2025, Super Micro issued a press release announcing financial results for fiscal year 2025, including reported net sales of $22.0 billion (an increase of 47% year-over-year). In the release, defendant Liang attributed the Company's growth to "strong demand for our AI and green computing solutions." The Compensation Committee subsequently certified, on August 26, 2025, that the Company had achieved the $21.0 billion revenue milestone under the 2023 CEO Performance Award based on the Company's previous four consecutive fiscal quarter, triggering vesting eligibility for the fifth and final tranche of the option award, subject only to satisfaction of the corresponding stock price goal.

137. On August 28, 2025, Super Micro filed with the SEC its 2025 10-K, signed by defendants Liang, Weigand, S. Liu, Liaw, Lin, Blair, Angel, Tuan, Giordano, and T. Liu. The 2025 10-K repeated the Company's representations that its internal control over financial reporting was effective, that the Company maintained controls to ensure compliance with applicable laws and regulations, and that the Company's reported sales growth was attributable to legitimate demand for the Company's AI infrastructure products.

138. On November 7, 2025, Super Micro filed its Quarterly Report on Form 10-Q for the first quarter of fiscal year 2026, signed by defendants Liang and Weigand. On February 6, 2026, Super Micro filed its Quarterly Report on Form 10-Q for the second quarter of fiscal year 2026, signed by defendants Liang and Weigand. Each of these reports repeated the Company's export-compliance representations and disclosed no information regarding any diversion of Company products to China through third-party distributors.

### F. The False and Misleading Proxy Statements

139. On April 24, 2025, the Company filed with the SEC its Definitive Proxy Statement on Schedule 14A (the "2025 Proxy Statement"). The 2025 Proxy Statement was issued during the period of misconduct alleged herein and was authorized by the Board. The 2025 Proxy Statement solicited stockholder votes to, among other things, elect defendants Blair and Giordano to three-year terms as directors of the Company; approve, on a non-binding advisory basis, the compensation of the Company's named executive officers for fiscal year 2024 (including the salary, bonus, equity awards, and other compensation paid to defendants Liang and Weigand); and ratify the appointment of the Company's independent registered public accounting firm.

140. On March 3, 2026, the Company filed with the SEC its 2026 Proxy Statement. The 2026 Proxy Statement was issued during the period of misconduct alleged herein and was authorized by the Board. The 2026 Proxy Statement solicited stockholder votes to, among other things, elect defendants Liang, T. Liu, and Tuan to three-year terms as Class I directors of the Company; approve, on a non-binding advisory basis, the compensation of the Company's named executive officers for fiscal year 2025 (including the salary, bonus, equity awards, and other compensation paid to defendants Liang, Weigand, and the Company's other named executive officers); ratify the appointment of BDO as the Company's independent registered public accounting firm for fiscal year 2026; and approve an amendment and restatement of the Company's 2020 Equity and Incentive Compensation Plan.

141. The 2025 Proxy Statement and the 2026 Proxy Statement (together, the "Proxy Statements") each described the Board's risk-oversight processes and represented that the Board, directly and through its committees, was actively engaged in oversight of the Company's material risks and compliance functions. The 2026 Proxy Statement stated:

> The Board oversees our risk management activities, requesting and receiving reports from management. The Board conducts this oversight directly and through its committees. The Board has delegated primary responsibility for oversight of risks relating to financial controls and reporting to our Audit Committee. The Audit Committee also assists the Board in oversight of certain other risks, including internal controls and review of related party transactions. The Audit Committee reports to the full Board on such matters as appropriate.

142. The Proxy Statements further represented that the Audit Committee's responsibilities included, among other things: "Reviews, approves and oversees all related party transactions in accordance with our related party transaction policies and procedures"; "Establishes and oversees procedures for the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters and oversees enforcement, compliance and remedial measures under our Code of Business Conduct and Ethics"; "Initiates investigations and hires legal, accounting and other outside advisors or experts to assist the Audit Committee, as it deems necessary to fulfill its duties"; and "Periodically reviews and discusses with management our major financial risk exposures, including cybersecurity events and steps management has taken to monitor and control the exposures, including our risk assessment and risk management guidelines and policies[.]"

143. The Proxy Statements further represented that the Compensation Committee "Monitors and assesses risks associated with our compensation policies, including whether such policies could lead to unnecessary risk-taking behavior, and consults with management regarding such risks." The Proxy Statements also represented that the Company's compensation policies and practices were not reasonably likely to have a material adverse effect on the Company.

144. The Proxy Statements further represented that the Company had adopted the Code of Conduct, applicable to all directors, executive officers, and employees, embodying "our principles and practices relating to the ethical conduct of our business and our long-standing commitment to honesty, fair dealing, accurate disclosures, and full compliance with applicable laws, rules, and regulations affecting our business."

145. The representations in the Proxy Statements regarding the Board's risk-oversight practices, the Audit Committee's compliance-oversight responsibilities, the Compensation Committee's risk-monitoring responsibilities, and the Company's commitment to legal compliance were materially false and misleading and omitted material information. Contrary to the representations made in the Proxy Statements, the Board was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful,

accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. The Proxy Statements further contained false and misleading statements concerning the Company's compensation policies and practices, because the Proxy Statements failed to disclose that the Compensation Committee had certified, and was poised to certify, vesting milestones under the 2023 CEO Performance Award based on Company revenues that were the product of illegal export-control violations.

146. The Proxy Statements also omitted to disclose material facts necessary to make the statements therein not misleading. In particular, the Proxy Statements omitted to disclose: (a) that a co-founder, sitting director, and senior officer of the Company—defendant Liaw—was actively orchestrating a scheme to divert billions of dollars' worth of Super Micro servers to China in violation of U.S. export-control laws; (b) that material portions of the Company's reported revenue and revenue growth were the product of that illegal conduct; (c) that the milestones under the 2023 CEO Performance Award were being achieved in part on the strength of revenues that were the product of illegal conduct; (d) that the Audit Committee's oversight of legal compliance was not functioning effectively; and (e) that the Board's decisions to nominate defendant Liaw for re-election in January 2024, and to retain him in his senior officer position, posed a continuing risk to the Company.

147. Pursuant to the 2025 Proxy Statement, on June 4, 2025, the Company's stockholders elected defendants Blair and Giordano to three-year terms as directors of the Company, approved on an advisory basis the Company's fiscal year 2024 executive compensation, and ratified the appointment of the Company's independent registered public accounting firm. The Company subsequently filed with the SEC a Current Report on Form 8-K announcing the results of the meeting.

148. Pursuant to the 2026 Proxy Statement, on April 15, 2026—less than four weeks after the unsealing of the Indictment of Director Defendant Liaw—the Company's stockholders elected defendants Liang, T. Liu, and Tuan to three-year terms as directors of the Company, approved on an advisory basis the Company's fiscal year 2025 executive compensation (including the milestone-based vesting of tranches under the 2023 CEO Performance Award), ratified the appointment of BDO as the Company's independent registered public accounting firm for fiscal year 2026, and approved the amendment and restatement of the 2020 Equity and Incentive Compensation Plan. The Company subsequently filed with the SEC a Current Report on Form 8-K announcing the results of the meeting.

**G. The Indictment of Defendant Liaw and the Co-Conspirators**

149. On March 19, 2026, the United States Attorney's Office for the Southern District of New York announced that a federal grand jury had returned an Indictment charging defendant Liaw and two co-conspirators—Chang (a sales manager in Super Micro's Taiwan office) and Sun (a contractor)—with conspiracy to commit export- control violations. Defendant Liaw was arrested by federal agents in California that same day.

150. The Indictment alleges that defendant Liaw and his co-conspirators "conspired to systematically divert" Super Micro servers containing certain Nvidia GPUs to China without a license, in violation of U.S. export-control laws. According to the Indictment, between calendar years 2024 and 2025, defendant Liaw caused the sale of at least approximately $2.5 billion worth of Super Micro servers OBON, with the knowledge that the majority of those servers would be diverted to China. The operational details of the scheme, the obstruction of the Company's internal compliance functions, and the obstruction of U.S. government export-control oversight are set forth in the paragraphs that follow.

151. On March 20, 2026, in response to the disclosures, the price of Super Micro's common stock declined $10.26 per share, or approximately 33%, from a closing price of $30.79 on March 19, 2026, to a closing price of $20.53 on March 20, 2026, a one day loss of over $6 billion in market capitalization. Following the disclosure, Super Micro placed defendant Liaw and another employee co-conspirator on administrative leave and terminated its relationship with the

contractor co-conspirator. Shortly thereafter, defendant Liaw resigned from the Board and departed the Company. However, the Board has not recovered any portion of the proceeds of the illegal sales or commenced any independent investigation of the failures of governance that enabled the scheme.

152. On March 27, 2026, *Reuters* reported that "Four Chinese universities, including two lined to the People's Liberation Army, bought Super Micro Computer servers with restricted AI chips over the past year."

153. The Company is now subject to multiple securities fraud class actions. The first occurred after the Hindenburg Report and is now moving forward in this Court, titled, *In re SMCI Computer, Inc. Securities Litigation*, C.A. No. 5:24-cv-06147-EJD (N.D. Cal.).

154. More recently, the Company has been sued in this Court by investors after Super Micro's stock crashed upon learning about the illegal actions to evade export controls over sales of Nvidia chips to China.

**DAMAGES TO SUPER MICRO**

155. As a result of the Individual Defendants' improprieties, Super Micro disseminated improper, public statements. These improper statements have devastated Super Micro's credibility as reflected by the Company's over $6 billion, or 33%, market capitalization loss after the news of the Indictment broke.

156. Super Micro's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Super Micro's current and potential customers and trading partners, including its core partner, Nvidia, consider Super Micro's ability to follow the law when it comes to their product. Businesses like Nvidia are less likely to award conduct transactions with Super Micro if it exposes them to violations of U.S. law. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

157. Further, as a direct and proximate result of the Individual Defendants' actions, Super Micro has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b) costs incurred from the investigations in Super Micro's violations of export controls laws;

(c) costs incurred from engaging in the related party transactions;

(d) costs incurred from the Board and Board committee investigations into the Company's wrongdoing; and

(e) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Super Micro.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

158. Plaintiff brings this action derivatively in the right and for the benefit of Super Micro to redress injuries suffered, and to be suffered, by Super Micro as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Super Micro is named as a nominal defendant solely in a derivative capacity.

159. Plaintiff will adequately and fairly represent the interests of Super Micro in enforcing and prosecuting its rights.

160. Plaintiff was a stockholder of Super Micro at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Super Micro stockholder.

161. The current Board of Super Micro consists of the following eight individuals: defendants Liang, S. Liu, T. Liu, Tuan, Lin, Blair, Giordano, and Angel. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Liang, S. Liu, T. Liu, Tuan, Lin, Blair, Giordano, and Angel Face a Substantial Likelihood of Liability for Their Misconduct**

162. As alleged above, defendants Liang, S. Liu, T. Liu, Tuan, Lin, Blair, Giordano, and Angel breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings. In addition, defendants Liang, S. Liu, T. Liu, Tuan, Lin, Blair, Giordano, and Angel authorized and are responsible for the misleading Proxy Statements, as detailed above.

163. Defendants T. Liu, Blair, and Angel, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the false statements. Further, the Audit Committee bore primary responsibility for the Special Committee's December 2, 2024, review of the eleven export-control transactions flagged by EY. The Special Committee, the work of which was reviewed and ratified by the Audit Committee, affirmatively cleared the Company of export-control violations, concluding that it "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions." That conclusion was false—as the Indictment unsealed approximately fifteen months later established, a member of the Board was at that very moment orchestrating the diversion of billions of dollars' worth of Super Micro servers to China, and continued the scheme through at least February 2026. The Audit Committee also failed to act or revisit that clearance notwithstanding the April 2025 internal compliance hold, the August 2025 BIS notification, and the other red flags described above. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

164. Defendants T. Liu, Tuan, and Giordano, as members of the Compensation Committee, had primary oversight responsibility for monitoring and assessing risks associated with the Company's compensation policies, including whether those policies could lead to

unnecessary risk-taking behavior. The Compensation Committee implemented a policy that supported defendant Liang's high-pressure sales culture and then certified the achievement of milestones under the 2023 CEO Performance Award based on Company revenues that were inflated by illegal export-control violations, including the April 22, 2025 certifications of three revenue milestones and the August 26, 2025 certification of the $21.0 billion revenue milestone.

165. Defendants Lin and Tuan, as members of the Governance Committee, had primary oversight responsibility for assessing director qualifications, recommending the resignation of directors no longer fit to serve, and providing guidance to the Board on legal-compliance matters. The Governance Committee has failed in these obligations as it has not provided guidance to the Board to act in the face of the numerous red-flags concerning the legal-compliance failures, which eventually gave rise to the Indictment. Further, the Governance Committee has continued to allow defendant Liang to act with impunity and as if Super Micro is his personal fiefdom.

166. Each of the members of the Board were required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

167. The Board is not independent of defendant Liang. It has shown that defendant Liang can act with impunity, allowing him to rehire employees tainted by the Company's previous accounting scandals. The Board has also refused to act as defendant Liang used Super Micro to enrich his family and make his brothers' companies key pieces of Super Micro's supply chain.

168. Defendants Liang and S. Liu are married. Thus, neither will initiate an action against the other.

## COUNT I

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**

169. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

170. The section 14(a) Exchange Act claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The section 14(a) Exchange Act claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of, fraud, scienter, or recklessness with regard to those nonfraud claims.

171. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."

172. Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

173. The Proxy Statements were materially false and misleading because the Individual Defendants were required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the

Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the Proxy Statements contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices and full compliance with U.S. laws.

174. The misleading information contained in the 2025 Proxy Statement was material to Super Micro's stockholders in determining whether to elect or re-elect defendants Blair and Giordano to the Board and to approve, on an advisory basis, the executive compensation paid for fiscal year 2024.

175. The misleading information contained in the 2026 Proxy Statement was material to Super Micro's stockholders in determining whether to elect or re-elect defendants Liang, T. Liu, and Tuan to the Board; to approve, on an advisory basis, the executive compensation paid for fiscal year 2025 (including the milestone-based vesting of tranches under the 2023 CEO Performance Award); to ratify the appointment of the Company's independent registered public accounting firm; and to approve the amendment and restatement of the Company's 2020 Equity and Incentive Compensation Plan.

176. The material misstatements and omissions in the Proxy Statements damaged the Company.

177. Plaintiff, on behalf of Super Micro, seeks relief for damages inflicted upon the Company based on the misleading Proxy Statements in connection with the improper re-election of defendants Liang, T. Liu, Tuan, Blair, and Giordano to the Board and the approval of executive compensation.

## COUNT II

**Against the Individual Defendants for Breach of Fiduciary Duty**

178. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179. The Individual Defendants owed and owe Super Micro fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Super Micro the highest obligation of care and loyalty.

180. The Individual Defendants and each of them, violated and breached their fiduciary duties.

181. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Super Micro has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

182. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Unjust Enrichment**

183. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Super Micro. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Super Micro, including the 2023 CEO Performance award.

185. In particular, defendant Liang received the economic benefit of the Compensation Committee's certifications, during the period of misconduct alleged herein, of four of the five revenue milestones under the 2023 CEO Performance Award—milestones that were achieved on the strength of Company revenues inflated by the illegal export-control diversion scheme. Defendant Liang received the associated vesting of four million shares of common stock at an exercise price of $45 per share.

186. Plaintiff, as a stockholder and representative of Super Micro, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

187. Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Super Micro, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of section 14(a) of the Exchange Act, breaches of fiduciary duties, and unjust enrichment;

B. Directing Super Micro to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Super Micro and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over its sales culture, including adherence to applicable laws;

2. a proposal to strengthen the Company's controls over financial reporting;

3. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4. a provision to permit the stockholders of Super Micro to nominate at least three candidates for election to the Board;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Super Micro has an effective remedy;

D. Awarding to Super Micro restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, [including all ill-gotten gains from insider selling by defendants; if applicable]

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: July 10, 2026

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
MARIA L. MANSUR

/s/ *Brian J. Robbins*
BRIAN J. ROBBINS

5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile (619) 525-3991
E-mail: brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com
mmansur@robbinsllp.com

Attorneys for Plaintiff

1733426

**VERIFICATION**

I, Joseph Cepeda, hereby declare as follows:

I am the plaintiff in this action. I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 7/10/2026

DocuSigned by:
Joseph Cepeda
4A035B0A96A0489...

JOSEPH CEPEDA